IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 19, 2014 Session

**FREDERICK ZAHN v. MARGARET ZAHN LOGAN**

**Appeal from the Chancery Court for Williamson County**
**No. 33441      James G. Martin, III, Judge**

---

**No. M2014-00441-COA-R3-CV - Filed February 2, 2015**

---

In this post-divorce action, Father filed a petition to modify the permanent parenting plan to make him the primary residential parent. The trial court found a material change of circumstance but concluded that it was not in the child's best interest to change the primary residential parent. We find no error in the trial court's decision and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Donald Capparella and Tyler Yarbro, Nashville, Tennessee, for the appellant, Frederick Zahn.

Robert J. Turner and J. Ryan Johnson, Nashville, Tennessee, for the appellee, Margaret Zahn Logan.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Frederick Zahn ("Father") and Margaret Zahn ("Mother") were divorced pursuant to a final decree entered on July 24, 2007, in Williamson County Chancery Court. The decree incorporated a marital dissolution agreement ("MDA"), and a permanent parenting plan ("PPP") concerning their only child, Quinn Logan Zahn. Under the terms of this agreed PPP, Mother was designated the primary residential parent, with 265 days of parenting time; Father had 100 days of parenting time. Father had parenting time every other weekend and

every Tuesday evening as well as summer and holiday time. Father's child support obligation was $1,284.00 per month. In December 2008, the parties entered into an agreed order modifying Father's child support obligation to $1,659.00 per month and addressing some communication issues.

On November 14, 2012, Father filed a petition to modify the PPP and for civil contempt alleging that there had been a material change in circumstances since the entry of the PPP for the following reasons:

(1) The child began attending first grade on August 1, 2012, and Mother allowed the child to "miss an unreasonable amount of school." Father stated that, according to school records, the child had missed ten days of school from September through November 2012. Father alleged that one of these absences was a result of Mother oversleeping and then refusing to take the child to school. At a parent-teacher conference, Father was told that, due to the number of days missed by the child, he would be required to have a doctor's excuse for any further absences. Mother told the teacher/principal that the child was sick on the days of the absences, but Father was not aware of the child being sick.

When Father questioned the child about one absence, "the child became upset and said his mother was sick." Although the school records showed that the child was absent on Halloween, Father remembered asking the child how school had been that day and the child answering that it was "good." Father asked the child why he had given this response when he had not attended school that day, and the child started to cry. The child told Father that "he lied because his mother told him to lie about missing school."

(2) Mother "has had irrational and unreasonable behavior." Father listed numerous examples of Mother's alleged irrational and unreasonable behavior—"inappropriate angry outbursts" (screaming at Father after he informed her that his flight would be delayed); physically assaulting Father on August 1, 2012, after taekwondo class (Father was helping the child with his seat belt, and Mother repeatedly slammed the car door on Father's leg); calling Father at 4:00 a.m. and ranting about the divorce; failing to require the child to wear his glasses; texting Father that she told the child that Father did not pay child support and that the child could read the PPP for himself; leaving a message threatening to slash Father's tires; referring to Father's second wife as a "slut" at a cub scout meeting at which the child was present; arriving with child five minutes after start of child's soccer game without child having socks or cleats on, becoming angry and blaming the child for their lateness, and accusing Father of failing to pay child support in front of the child; calling during a trip to Washington, D.C. to ask Father for more money and threatening that the child would be stranded on the side of the road if Father did not deposit the money; when the child asked why both parents weren't going on a cub scout camping trip, saying, "because your dad is

2

a bastard"; and making derogatory and inappropriate comments while the parents took the child trick-or-treating together, in addition to kicking Father in the back of the leg several times.

(3) Mother "is not able to meet the basic needs of the child," and "he is frequently dirty and has a foul smell." As examples, Father asserts that, when he met Mother and the child at the veterinarian's office on August 8, 2012, the child's shirt "had a strong smell of cat urine." He immediately bought a new shirt for the child. When Father dropped the child at Mother's house on August 21, 2012, Mother "opened the door and garbage spilled out of the house because of the level of filth." He noticed that "the house smelled of cat urine and feces from outside the door." On August 31, 2012, the child told Father that he did not have matching socks to wear to school because Mother was not washing them. Father bought the child some socks. On October 14, 2012, when he dropped the child at Mother's house, Father again noticed a strong smell of animal urine and feces. When he picked the child up from school on October 27, 2012, Father noticed that the child's clothes were dirty and that the child was not wearing underwear. The child said that there were no underwear in his drawer. The parents got into a loud disagreement on Halloween when Father discovered that the child was not wearing underwear under his costume.

Father further alleged that Mother willfully violated the provision of the PPP entitling both parents to the right to be "free of unwarranted derogatory remarks made about the other parent or his or her family by the other parent to the child or in the presence of the child." Father asserted that Mother had violated this provision by (a) telling the child that Father did not pay child support and mentioning to the child that he could read the PPP for himself; (b) referring to Father's second wife as a slut in the child's presence; (c) accusing Father of not paying child support in front of the child; and (d) telling the child that he could not be around Father's co-workers because they were "sluts, homewreckers and a bad influence," and saying, in front of the child, that Father had abandoned the child and that Father "f---ed another girl in high school."

Father requested that he be named the primary residential parent, that his child support obligation be modified, and that Mother be found in willful civil contempt. In the proposed parenting plan submitted by Father, he requested that Mother have 80 days of parenting time and that he have 285 days of parenting time.

Mother answered the petition, denying most of Father's allegations. She stated that the child had been sick with recurrent abdominal pain, which caused him to miss school. She further alleged that Father made insulting remarks to her.

On March 13, 2013, the court entered an agreed restraining order providing that the

3

parties were "enjoined and restrained from using any corporal punishment" on the child; that the parents agreed to administer medications and follow all physician recommendations regarding any medical issues of the minor child; that they would make sure the child attended school every day "unless a medical emergency exists" and that a "parent should notify the other parent before allowing Quinn to miss school"; and that the parents "shall not ask Quinn to lie or keep important information from the other parent or discuss the pending litigation with Quinn."

The trial court permitted Father to file an amended petition to modify the PPP and for civil contempt on May 20, 2013, and a second amended petition on November 14, 2013. This second amended petition contains many of the same allegations set forth in the initial petition. We will summarize only the new allegations:

(1) Absences. Father listed five additional absences from school since November 2012—four in February and one in March 2013. He also listed seven days when the child was allegedly tardy to school. Father asserted that, on February 28, 2013, he e-mailed the child's teacher with a doctor's note for two legitimate absences resulting from a medical procedure. He was informed by the teacher that the child had missed school the previous week as well. The child told Father that "he did not go to school because [Mother] was confused and thought it was Saturday [so] she slept too late to take him to school. [Mother] ended up taking the child to work with her."

(2) Irrational behavior. Father described additional incidents. On March 9, 2013, prior to a soccer game, Father noticed that the child's face was red and asked him about it. The child was upset but did not want to talk about it. Father asked Mother about it. Although she initially denied hitting the child, she then admitted it. She said that she hit him because the child was misbehaving, walking on the furniture; she told him to stop, but he said he did not know how. She "hit him in the face for talking back." According to Father, Mother then pulled the child out of the soccer game to reprimand him for telling Father what had happened. She said that Father was going to call the police and they would not be able to go to the movies now.

(3) Meeting basic needs. Father cited additional examples. On February 28, 2013, the child had a minor surgical procedure performed by a urologist. Father alleged that Mother failed to perform the post-operative care and told the child that "he was old enough to take care of it himself."

Father also alleged that, on October 9, 2013, the child told Father that he had hurt his finger on October 7, 2013, while at his after-school program and that his finger still hurt when he tried to bend it. When he examined the finger, Father saw that it was discolored and

4

swollen. Father took the child to the doctor. An x-ray revealed that the finger was fractured, and it was recommended that the child see an orthopedic surgeon. When Father contacted Mother, she stated that she knew about the injury but that she did not provide any type of treatment.

As to Father's contempt petition, he made no new factual allegations. In his proposed PPP, Father asked that he be made the primary residential parent with 285 days of parenting time, while Mother would have 80 days of parenting time. Mother would have parenting time every other weekend as well as holiday time. Father further proposed conditions upon Mother's parenting time: that she be required to clean her house and maintain "a reasonable level of cleanliness," that she complete a program of anger management, that she attend weekly counseling, that both parties provide clean clothing for the child, and that Mother provide healthy food for the child. Father proposed that he have authority to make all major decisions regarding the child. Father requested that Mother pay $744.00 per month in child support.

Mother answered Father's second amended complaint, and the parties engaged in discovery. On January 28, 2014, the court entered an agreed order stating that the parties agreed that there would be no other witnesses to testify at the hearing with the exception of the parties themselves.

## The hearing

The matter was heard on January 29, 2014, at which time the child was seven years old. Father introduced school records and testified that, during his first grade year, the child was absent fourteen days and tardy seven days. Father was aware that child had a medical procedure on two of those days; as to the other days, he was not notified that the child was sick or that he was going to miss school.

Father testified that, on August 1, 2012, after the child's taekwondo class, while he was helping child with his seat belt in Mother's car, Mother became enraged, started yelling, and slammed the car door into Father's leg. Father introduced a photograph showing injuries to his leg.

Father further stated that, on August 15, 2012, at around 4:00 a.m., Mother called multiple times and sent him multiple text messages "just kind of ranting and saying crazy things centered around our divorce." Father read one of the text messages into evidence. In it, Mother threatened that she might have to move out of state in order to find a job.

Father described an incident on August 31, 2012, when he was about to pick the child

5

up for his parenting time and Mother told the child that Father would not bring him home to allow him to go to a birthday party with her. According to Father, this was a birthday party to which the child had been invited by one of his friends, but Mother insisted that she was to go with the child, not Father, and she refused to tell Father where and when the party was taking place. Father testified that Mother also stated she had allowed the child to read the PPP and the child saw that Father had signed agreeing to the amount of parenting time he had. Mother eventually relented and told the child when the party was because he was upset about missing it. Father stated that, as he and the child were leaving Mother's condominium, she called after them, "Well, I guess we'll just have to see about this in court, and enjoy your flat tires in the morning."

On September 5, 2012, Father testified, both parents were with the child at a cub scout meeting. During the meeting, Mother repeatedly referred to the child's stepmother as "the slut" and to his stepsister as "the little dike," while speaking to the child and Father.

Father further testified that, on September 8, 2012, Mother and the child arrived late to the child's soccer game, and Mother was angry, saying it was the child's fault that they were late. After the game, as Father was helping the child get into Mother's car, Mother started reprimanding Father, telling the child that Father was not taking all of his parenting time and was not paying all of the child support he owed.

Father testified that, on October 5, 2012, Mother took the child on a vacation to Washington, D.C. Early in the morning on October 10, 2012, Father received a call from Mother saying that she was in Washington, had run out of money, and could not get home. She asked Father to make a deposit into her bank account right away. Father asked if she could just use a credit card, but she said she was out of money. Mother allegedly threatened that, if Father did not give her the money right away, the child "is gonna be standing at the side of the highway stranded." Father deposited the money Mother requested.

On October 14, 2012, when Father was about to return the child to Mother, he received a text message from Mother stating that she did not have any food so Father should feed the child dinner. Father took the child to dinner and then went to Mother's home. When he dropped the child at Mother's home, Mother was angry because they arrived late and accused him of being in violation of the parenting plan. Child asked about the upcoming cub scout camping trip and wanted to know which parent was going to take him. Father testified that Mother said to the child, "I wish we could both go, but we can't both go because your dad is a bastard."

Next, Father testified about the events of Halloween 2012. Although it was Father's year to have the child on Halloween, he agreed to Mother's request that they both go trick-or-

6

treating with the child. They had done this the previous year at the child's request. They met at McDonald's to have dinner. In the bathroom at McDonald's with the child, Father discovered that the child was not wearing any underwear underneath his costume. When Father told Mother this, she became angry with the child and started screaming at him in the restaurant. They went back home, and the child put clothes on underneath his costume.

While they were trick-or-treating, Father pointed out that one of his friends lived in the neighborhood and that they could go there; Mother told the child, "You can't be around your father's coworkers because they're homewreckers, sluts, and bad influences." Father cautioned Mother about making such comments in front of the child, but she continued to do so. Father pointed out that Mother's actions were in violation of the parenting plan, and she said that she did not care. Father asked if she would care if she knew he was taping the conversation. According to Father, Mother "lost it" and started screaming and accusing Father of entrapping her. Mother pulled the child aside, sat down on the curb, and told the child that they could not trick-or-treat if Father was there. She threatened to call the police if Father was there. Father further testified that Mother told the child that Father had "f---ed another girl in high school." Father was able to take the child away from Mother and continue trick-or-treating. Mother kept running up behind them and kicking Father in the back of the legs; she continued to yell at Father. Father continued:

> And eventually we went back to her car. And she put Quinn in the car and told me, "Look, destroy the tape and you can have a ride back to your car. If not, you're gonna have to walk," which it was only three miles, or something, so that was not that much of a threat in my mind. So they left and I walked back to the car.

On March 9, 2013, Father got a call from Mother to meet them in the parking lot at the soccer field to help get the child to the soccer game on time. When he saw the child, Father noticed that the left side of his face "was just completely, you know, dark red, mottled." He confronted Mother and asked if she had hit the child. She denied it at first, but then admitted that she had hit him in the face because he was misbehaving. Mother told Father that the child was "walking on furniture and that she told him to stop walking on the furniture and that he had talked back to her by saying he didn't know how to stop." She then felt that she had no choice but to hit him and that it was not Father's business. Mother went and pulled the child off of the soccer field (where they were warming up) and reprimanded him for telling his Father about her hitting him. She told him that Father was going to call the police and that she was not going to be able to take him to the movies after the game.

Father testified that he was concerned about "all kinds of things around medical issues, hygiene, just a dirty, dirty house, things like that." As to the incident on August 8,

2012, when he picked the child up when he was with Mother at the veterinarian's office, Father stated that he could smell cat urine when the child was about six feet away. When he got close to the child, he confirmed that the child's shirt reeked of cat urine. Father took the child to the store and bought him another shirt and texted Mother about the cat urine smell on his shirt. She stated that she did not know how this could have happened. Father told her that the child reported getting the shirt from a hanger in his room. Mother stated that this was not possible because all of his clothes were dirty. She was "going to the closet outside because everything was dirty." Father read the entire text exchange into evidence. Father testified that he thought Mother had two dogs and three cats and "maybe some small animals, like a hamster, or something, and fish."

On August 21, 2012, according to Father's testimony, he was picking the child up at Mother's home, and "she opened the door and . . . the smell wafting out of the . . . house from, you know, several feet away was just overpowering. And there was just so much filth and clutter that garbage just came spilling out of the house when she opened the door, just bags and papers and cans." While at Mother's home on October 14, 2012, Father was overwhelmed by the odor. After he left, he sent her a text message expressing his concerns and suggesting that they stay in a hotel that night.

The day that the child had an outpatient surgical procedure, February 28, 2013, Father took him home with him and cared for him for the next several days. Some post-operative care of the incision was required as well as the application of medicine. After the child returned to Mother, Father inquired how things were going and about the post-operative care. Mother reportedly told Father that the child was "plenty old enough to take care of that kind of thing himself so she was not assisting him in doing it, but she assumed that he was doing it."

Father then testified about an incident on October 9, 2013, when he picked the child up at taekwondo class. When they got home he noticed that the child's pinky finger was swollen and discolored, and the child was unable to bend it. Father took the child to the doctor the following day, where the finger was x-rayed and determined to be broken. The finger was splinted. Father learned from Mother that the injury had occurred a few days earlier. She had not thought that it was anything serious and had not administered any treatment.

Father described his house as being clean. He had one dog, and he kept up with the laundry. He further testified that, if he became the primary residential parent, the child would attend Sunset Elementary, a top-rated elementary school, and that Father would be able to take him to and pick him up from school. The child had a few friends in Father's neighborhood. Father testified that he would promote the child's relationship with Mother.

8

In his proposed parenting plan, Father asked that he be made the primary residential parent so that he could have the child during the week. He also requested that he be given decision-making authority. When asked to explain the reason for these changes, Father testified as follows:

> A couple of reasons. For the time part of it, you know, because what started it—really, one of the driving things was, you know, she wasn't taking him to school and I feel it's important that he get to school, you know. In a single school year, in my mind, 14 absences and 7 tardies is just unacceptable, unless there's an actual reason. But this—these were just, you know, she overslept and didn't feel like taking him. So that's basically the time, so that he would be with me when he's in school so that I could make sure that he gets to school because, you know, again, it's important.

> Decision-making I feel it's important to change because right now I feel like his mom uses the joint decision-making as a tool to get her way as opposed to a tool to make sure the right thing is being done for Quinn. So, you know, she will object to things just for spiteful reasons. You know, she—she won't want him to go to camp because I had—because she claims I am behind in child support. So, you know, she'll say, "well, I'm not gonna let him go to camp, because that's a joint decision, unless you give me money" or anything—you know, something like that.

On cross-examination, Father admitted that the child had been a straight A (or the equivalent for kindergarten) student all three years that he had been in school at West Meade Elementary and living with Mother. Father acknowledged that Mother and the child had been living in their condo for about six years, that the child's elementary school was about five minutes from their home, and that the child had friends from school. Mother's attorney introduced school awards received by the child: the principal's award, the principal's list ribbon, an outstanding effort certificate, and a certificate of citizenship. The child's second grade report card, to date, showed 45 days present, no absences, and no tardies. Father admitted that Mother had improved in getting the child to school.

Father admitted calling Mother offensive names, but stated that he had never done so in front of the child.

Mother's attorney questioned Father concerning his allegations about odors in Mother's house. Father testified that he had noticed these smells at Mother's house in the last few years. On one occasion, he said, the smells were so strong they made his eyes water. He acknowledged that he never called any authorities or filed a motion to force Mother to

9

clean up her house.

Mother's attorney questioned Father as to whether the cat urine smell on child's shirt on August 8, 2012, could have come from the veterinarian's office. Father did not think that was the source of the smell.

On redirect, Father testified that the child was prescribed glasses for a lazy eye. He had several surgeries on the eye. Father learned that, when the child was with Mother, she was not having him wear the glasses. Father talked to Mother about the glasses, and she agreed that she had not been making the child wear the glasses. She was not aware of what he had been doing with them. According to Father, the eye was still "kind of lazy," and the child wore the glasses sometimes and did not wear them at other times.

Mother testified next. She lived in the Bellevue area of Nashville with the child. She was a registered nurse and nurse practitioner and was currently in a doctorate program for nursing. The child attended West Meade Elementary school. Mother introduced photographs of her residence, a two-bedroom condominium where she and the child had been living for six years. Mother was currently employed as a nurse practitioner at a drug and alcohol facility for women who are near-homeless or homeless due to drug addiction and mental illness. Her gross annual salary was $60,000. Mother had received alimony for six years, but that had ended.

Mother stated that the child attended Fun Company, a child care program, after school and during the summer.

Mother described the kinds of activities she and the child did together, such as homework, reading before bed, and hiking on the weekends. Mother talked about taking care of the child when he was little, changing his diapers, feeding him, packing his lunch, and playing with his toys with him. According to Mother, the child loved his pets—three cats, two dogs, and fish—and helped take care of them.

Asked about the incident with mismatched socks, Mother testified that it "was a thing at school for a while to wear mismatched socks, so he had been doing that." She denied the allegation that there were times when the child did not have clean clothes. She stated that she was able to provide the child with adequate clothing as well as adequate medical care.

Mother testified that she was satisfied with the quality of the education the child was receiving at West Meade. She stated that he was an exemplary student and had received a number of awards. Mother testified that the child had friends at school and in the community where they lived.

10

Next, Mother was asked about the child's medical issues. She stated that he had a lazy eye and crossed eyes, for which he had two surgeries as an infant. He also had a urological procedure. Mother discussed the glasses that were prescribed for the child, which he was to wear to see close up. She testified that the way the child was to wear the glasses had changed through the years. Mother was asked whether there was a problem with the eyeglasses a summer or two earlier. She testified:

> A set of glasses got made where the bifocal was set too high. So if he looked through it—he's supposed to look straight ahead and there be no correction. But if he looks close, it's supposed to help the eyes with this cross-eyes. But this—the bifocals were set too high, so that he would be crossing his eyes inappropriately. So me and his father had a discussion that we would wait until the August 22nd doctor's appointment and not send them to school the first few weeks, just wait for the August 22nd appointment to get the correct—in case the prescription changed, and then go from there to get him the next set of corrective lenses.

Mother stated that everything was okay and on schedule with the child's eyes now.

As to the urological problem, prior to the corrective surgery the child experienced constipation. Mother testified that, in September, October, and November of 2012, the child was having "really bad belly pain." Mother was "working with the doctor, giving him laxatives, giving him enemas, but he was still having the pain." Father sometimes accused Mother of "making it up." Eventually, the doctor referred them to a urologist, who discovered the cause of the problem. Surgery was performed in February 2012.[1]

Mother was questioned about the allegation that she did not help the child with the postoperative care of the incision site. She testified that, "The first two days he was home with me, and I was doing it the three times a day, helping him with it." Then, the child went to Father's house. When the child returned from Father's house, he told Mother that Father was allowing the child to do it himself with Father watching, and the child wanted to do that at Mother's house. So, that is what Mother did. Mother testified: "I would watch him do it, and if he didn't do it correctly, I would then go behind him and do it." She denied Father's testimony that she told him that she just let the child do it himself and that she didn't do anything.

Mother testified about all of the care she had given the child since his birth—changing diapers, bathing, dressing, feeding, potty training, doctor's appointments, taking him to

---

[1]It appears Mother intended to say February 2013.

school, etc. Mother denied having an unclean home or ever having any complaints from neighbors or citations for having an unhealthy home.

Mother's attorney went through the allegations of Father's petition. As to the allegations regarding September 22, 2012 (that the child did not go to school because Mother overslept), Mother testified that there was a day that she was sick and called Father to say that she did not think she could drive the child to school. Father refused to help; when Mother informed him that she would have to keep the child home, Father agreed. The child called Father later that day. Mother testified that she had never been told that the child would need a doctor's excuse if he missed any school.

Mother testified that the child had not missed any days of school during the first reporting period of the second grade. With respect to the days missed in first grade, Mother testified that there was a day in September when she was sick. As to the remaining days:

> And then in that September, October, all those days where he was sick or late, was he was having all these stomach pains. The days he was late, a lot of times he would either go to the bathroom and would feel better and I could get him there, or he wet himself, so we would have to bathe and get him dressed into clothes. Then on February 11th and 19th, I took him to . . . his primary pediatrician. One of those, I'm not sure which one, he had a fever, and the other one he had an earache. And then February 28th and March 1st was his [urological] procedure . . .

> Now, the school—in the January and March time frame, the school was having problems with the way people were coming into the school. . . . and it was causing a backup in traffic. The school was trying to handle it. What they started doing was just saying you're late. So some of those lates are from me being stuck in the traffic lane.

Mother denied the allegation that she physically assaulted Father on August 1, 2012, by closing the car door on his leg. She claimed that she did not hear about the allegation until the petition was served. Mother denied shutting the car door on Father's leg.

As Mother's counsel went through the list Father's allegations, Mother continued to deny them. With respect to the Washington, D.C. trip, Mother testified that the child wanted to stay an extra night; he called Father on the telephone, talked to him about the situation, and then handed the phone to Mother. Father agreed to lend Mother the money ($300) to allow them to stay another night, and she paid him back. Mother denied saying that the child would be stranded on the side of the road if Father did not lend her the money.

12

Mother testified about the events of Halloween 2012. According to her, after discovering that the child had no underwear on under his costume, Father came out of the bathroom at McDonald's and started yelling at Mother that she was incompetent for not having the proper clothes on the child. This occurred in front of the child. Mother took the child home to put on proper clothing, and they all continued to go trick-or-treating. Mother continued testifying:

> While we were trick-or-treating, the whole time, [Father] would make derogatory looks at me, whisper things under his breath to me, just doing all kinds of things, rolling his eyes. If I went to help Quinn—he just was making the situation really tense. And then by the end, I just didn't—I was afraid of what was going on, so I didn't want him near me because I was afraid he was going to accuse me of stuff. Some fighting did ensue when Quinn was going in between the houses, and I just wanted to stop . . . .

Mother admitted calling Father's friends and co-workers derogatory names and saying that Father had sex with another girl in high school, but denied saying those things in front of the child. She denied kicking Father in the back of his legs.

Mother admitted slapping the child when he refused to stop jumping on their leather furniture while wearing his cleats. She denied reprimanding the child for telling Father what had happened or telling the child that Father was going to call the police.

On cross-examination, Mother admitted speaking to Father about paying taekwondo fees late in front of the child. As to the Washington, D.C. trip, she testified that she did not recall saying anything about being "stranded," but that it was possible she would have said something like that as a joke. Mother admitted making inappropriate comments on Halloween but maintained that most were not in the child's presence. She said that both parents were yelling, and "it had become a bad scene by the end."

## Trial court's decision

After hearing all of the evidence, the trial court made detailed oral findings of fact and conclusions of law on January 29, 2014. Reviewing the key allegations, the court questioned Mother's credibility and credited Father's testimony with respect to a number of the incidents at issue. The court concluded that there had been a material change of circumstance since the entry of the final decree in July 2007. The court noted that Mother's "behavior has really been inappropriate in a lot of ways."

The court proceeded to analyze the statutory factors pertinent to the best interests of

the child set forth in Tenn. Code Ann. § 36-6-106(a).[2]

• Factor 1: The court found that the love, affection, and emotional ties between the child and the parents favored neither parent. The child loved both parents equally.

• Factor 2: Both parents had an equal ability to provide for the child's basic needs for food, clothes, medical care, and other necessities. The court noted that Mother had been the child's primary caregiver since he was born, but that she had struggled in that role due to emotional difficulties and economic problems.

• Factor 3: The importance of continuity and how long "the child has lived in a stable, satisfactory environment." Tenn. Code Ann. § 36-6-106(a)(3). The child had lived with Mother for six years since the divorce, excelled in school, had made friends, and was involved in activities. The court found this to be a satisfactory environment except that Mother "dropped the ball in taking care of this house and keeping it clean and at times doing the things that you ought to do." The court felt, however, that the petition had gotten Mother's attention and that she had been doing better since 2012. The court concluded that "this factor really weighs in favor of the mother and not in favor of changing custody."

• Factor 4: The "stability of the family unit of the parents." Tenn. Code Ann. § 36-6-106(a)(4). The court found that Father's family unit had not been stable, noting that he had remarried and divorced since the parties' divorce. Mother had not remarried and had been devoted to the child, her job, and her education. This factor favored Mother.

• Factor 5: The mental and physical health of each parent. The court found no concerns with respect to Father; Mother admitted suffering from depression after the divorce, and the court stated that "the only explanation for this kind of behavior that occurred in 2012 . . . is that you're not in control of yourself." It appears that this factor would favor Father.

• Factor 6: As to the home, school, and community record of the child, the court "can't say anything but good things about it." It appears this factor favors Mother.

• Factor 7: Preference of child if 12 years or older—not applicable.

• Factor 8: Evidence of physical or emotional abuse. (To be discussed fully below).

_____

[2]Tenn. Code Ann. § 36-6-106, prior to its amendment in 2014. *See* 2014 Tenn. Pub. Acts ch. 617.

14

The court determined this factor to favor Father.

- Factor 9: Character and behavior of persons who frequent the home. There was no evidence of persons who frequented either home who would have a bad influence on the child.

- Factor 10: Each parent's past and potential for future performance of parental responsibilities, including the willingness to encourage a close relationship between the child and the other parent. The court found that "this factor really favors, in my mind, Mr. Zahn. I think Mr. Zahn has conducted himself throughout these proceedings in the most commendable way." As to Mother, the court stated that, "there's a lot of evidence that you have sort of shut down in terms of things with Quinn and his dad, and this is of concern to this Court." The court concluded, however, that, "I don't find this factor to outweigh all of the other factors in this case."

After considering all of these factors, the court stated:

I cannot get past the conclusion that we have a child that's thriving. And it is remarkable that he is thriving, given the findings that I have made concerning the difficulties that surround him. But the unrefuted testimony is that he is thriving. And I'm really reluctant to disturb that.

I don't think it will last, Ms. Logan, unless you and Mr. Zahn change the way you do business with one another. Sooner or later your child won't be thriving, and you and Mr. Zahn will find . . . yourselves in a position where you will look back on this time in 2014 and regret you didn't do a better job to co-parent. And I hope—I hope this is the divorce that you never had. I hope for both of you that this hearing, this trial, and these proceedings is a catharsis and that you've got it out of your system and that at the end of the day you're going to say, "I love my son more than I hate my former spouse." Because that's what it boils down to.
. . .

So while I have found that there's been a substantial and material change of circumstance since the entry of the final decree, I do not find it to be in the best interest of Quinn to change custody.

In its final order, entered on February 18, 2014, the trial court incorporated the findings of fact and conclusions of law made on January 19, 2014, and denied Father's petition to

15

modify the permanent parenting plan based upon its finding that it was not in the child's best interest to change custody.

## Issues on appeal

Father asserts that the trial court erred in: (1) failing to make him the primary residential parent; (2) failing to follow the statutory directive to limit the parenting time of an abusive parent; (3) failing to follow the statutory directive to permit maximum parental participation; and (4) denying his request for attorney fees.

## ANALYSIS

With respect to a petition to modify a permanent parenting plan to change the primary residential parent, the threshold issue is whether there has been a material change of circumstance since the plan took effect. *See* Tenn. Code Ann. § 36-6-101(a)(2)(B); *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003). If the trial court finds that there has been a material change in circumstances, it must then determine whether it is in the child's best interests to modify the parenting plan as requested. *See* Tenn. Code Ann. § 36-6-106(a); *Cranston*, 106 S.W.3d at 644. On appeal, neither party disputes the trial court's conclusion that there was a material change in circumstances. Therefore, the only issues before this court concern the child's best interests and the parenting plan.

Our review of the trial court's findings of fact is de novo with a presumption of correctness, unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *Marlow v. Parkinson*, 236 S.W.3d 744, 748 (Tenn. Ct. App. 2007). "When the trial court makes no specific findings of fact, however, we must review the record to determine where the preponderance of the evidence lies." *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002).

A trial court's determinations as to "whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We presume that the trial court's findings of fact are correct unless the evidence preponderates against them. TENN. R. APP. P. 13(d). To preponderate against the trial court's findings of fact, the evidence "must support another finding of fact with greater convincing effect." *Austin v. Gray*, No. M2013-00708-COA-R3-CV, 2013 WL 6729799, at *6 (Tenn. Ct. App. Dec 18, 2013*).* "Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges." *Armbrister*, 414 S.W.3d at 693 (citations omitted).

16

Thus, "[a] trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion." *Id.* A trial court abuses its discretion when its decision "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

(1)

We begin with Father's argument that the evidence preponderates against the trial court's decision to allow Mother to remain the primary residential parent. Father essentially maintains that the trial court erred in balancing the statutory factors regarding best interests.

Father focuses his argument on a number of the best interest factors that he asserts the trial court failed to consider properly. As to factor eight, the court made the following findings:

> I don't have any evidence of physical or emotional abuse to Quinn other than this occasion when the mother slapped him. And, of course, while the Court can't condone that conduct, Ms. Logan, I can also understand if he's walking around on your furniture with cleats on that you need the father—you need the help of Mr. Zahn. Well, Mr. Zahn is unavailable to you because you two are at loggerheads with one another. So you acted in an unreasonable way. And I would suggest to you that grounding him, putting him in the corner, not taking him to a soccer game, depriving him of some privilege might be a more appropriate way to discipline him than slapping him. Because if the way you discipline your child is by slapping him, then he's going to learn that's the way you deal with other people, and I don't think that's what you want.

Father argues that the court, while finding that this factor favored Father, failed to consider evidence relevant to this factor and to give the factor appropriate weight.

The version of Tenn. Code Ann. § 36-6-106(a)(8) in effect at the time of the trial referenced the definition of child abuse in Tenn. Code Ann. § 39-15-401.[3] Tennessee Code Annotated section 39-15-401(a) defines child abuse, *inter alia,* as occurring when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . ." Relying upon the first sentence of the quoted paragraph of the court's findings, Father contends that the trial court found Mother to have

---

[3]Tenn. Code Ann. § 36-6-106 was amended by 2014 Tenn. Pub. Acts ch. 617, which took effect on July 1, 2014.

committed child abuse. In the subsequent sentences, however, the court minimizes the significance of Mother's "unreasonable" conduct, characterizing it as an unwise disciplinary choice and an isolated incident. The language of Tenn. Code Ann. § 36-6-106(a)(8) in effect at the time of the trial provided as follows:

> Evidence of physical or emotional abuse to the child, to the other parent or to any other person; *provided, that*, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence.

(Emphasis added). While we do not condone Mother's actions, the court considered the effect of this incident on the physical and emotional safety of the child and does not appear to have found abuse.

We find no merit in the Father's assertion that the trial court erred by failing to consider other evidence relevant to the abuse factor. It was only required to make specific findings with respect to any allegations of child abuse and child sexual abuse. The only allegation that could have fallen within the category of child abuse is the slapping incident which, as discussed above, the court fully considered. In particular, Father points to the incident where Mother allegedly slammed her car door on Father's leg, to Mother's alleged threats to slash Father's tires, and to her other alleged hostile statements to Father. The court was not required to make specific findings as to whether these incidents constituted abuse as they could not constitute child abuse or child sexual abuse. The trial court did consider the evidence regarding all allegations of abuse in its general findings prior to its determination that there had been a substantial and material change of circumstances.

The evidence does not preponderate against the trial court's findings with respect to factor eight.

The trial court determined that factor ten—each parent's past and potential for future performance of parenting responsibilities, including a willingness to foster a close relationship between the child and the other parent—weighed heavily in favor of Father. Father asserts that this factor should have been given substantial weight and warranted a change in the designation of the primary residential parent. Father cites caselaw where this factor was given substantial weight. *See Williams v. Singler*, No. W2012-01253-COA-R3-JV, 2013 WL 3927934, at *14 (Tenn. Ct. App. July 31, 2013); *Killion v. Sweat*, No. E1999-

18

02634-COA-R3-CV, 2000 WL 1424809, at *3 (Tenn. Ct. App. Sept. 21, 2000). There are other cases, however, where this factor was not determinative. *See, e.g., Hayes v. Pierret*, No. M2012-00195-COA-R3-CV, 2013 WL 3346847, at *5 (Tenn. Ct. App. June 27, 2013).

As to factor two, the ability of the parents to provide the child with food, clothing, medical care, and other necessities, and the degree to which the parent has been the primary caregiver, Father asserts that the trial court found the parties to be equal. The trial court expressly stated that it found the parties to be equal as to their ability to provide the child with the basic necessities. With respect to Mother being the primary caregiver, it appears that this factor would favor Mother.

As to the first part of factor two, the provision of basic necessities, Father asserts that the trial court erred in disregarding the parties' "disposition" to provide care. He focuses on the evidence suggesting that Mother had not provided the child with a clean home, had failed to provide him with clean clothes, and had failed to get the child to school in a timely and regular manner. The trial court made specific findings, however, that the allegations regarding the cleanliness of Mother's house related to 2012, not 2013, and the court thought that the petition had gotten her attention. The trial court remarked that, during 2012, Mother was unemployed and under a lot of stress. Moreover, the uncontroverted proof showed that, during the first quarter of the 2013-2014 school year, the child had not been absent or tardy.

The evidence does not preponderate against the trial court's findings with respect to the parties' disposition to provide the child with the basic necessities.

With respect to factor three, the importance of continuity and the length of time the child has lived in a stable, satisfactory environment, Father argues that the trial court erred in placing too much importance on this factor. Because of the importance of stability to a child's well-being, courts have emphasized "continuity of placement in custody and visitation cases." *Gaskill*, 936 S.W.2d at 630. Continuity, however, "does not trump all other considerations." *Id.* Father emphasizes that, although the child made good grades, enjoyed extra-curricular activities, and was generally a happy child, his well-being was not necessarily attributable to Mother's care. In fact, Father argues, the trial court acknowledged this fact in its findings when it stated: "Ms. Logan, you will concur with the Court that you have not acted the way you should have acted on many occasions. And you're just very fortunate that your son isn't suffering because of it."

Father has not convinced us that the trial court erred in placing importance on continuity in determining the best interests of the child.

As to factor four, the stability of the family unit, Father contends that the trial court

19

erred in weighing this factor in Mother's favor in light of the evidence of abuse by Mother and her open hostility toward Father. We discussed the trial court's analysis of the abuse allegations above. This factor addresses the stability of each family unit, and not the relationship between the divorced parties.

Factor six is the home, school, and community record of the child. The trial court could say only good things about the child's performance and appeared to weigh this factor in favor of Mother. Father objects that the court did not mention his involvement in the child's activities. Father also assigns error to the court's failure to take into account Mother's failure to adequately explain all of the child's absences and tardies. Father argues that this factor should favor both parties, or tilt in his favor. The trial court did not actually state whether this factor favored one parent, although it appears that it favored Mother. As stated above, the evidence showed that Mother was now getting the child to school every day. Although Father had some involvement in the child's activities, Mother was the primary caregiver. The evidence does not preponderate against the trial court's decision to weigh this factor in favor of Mother.

Finally, Father asserts that Mother's lack of credibility should have been considered as a factor against her in the best interest analysis. Although credibility is not listed as a factor, Tenn. Code Ann. § 36-6-106(a) states that the court "shall consider all relevant factors." In its findings prior to reaching the best interest issue, the trial court addressed Mother's lack of credibility. It did not specifically mention her credibility in the best interest analysis. We find no error in the trial court's failure to consider Mother's credibility as a distinct factor in the best interest analysis.

We, like the trial court, are troubled by Mother's conduct, but we cannot say that the evidence preponderates against the trial court's finding that it was in the best interest of the child for Mother to remain the primary residential parent.

(2)

Father next argues, pursuant to Tenn. Code Ann. § 36-6-406(a)(2),[4] that the trial court

---

[4]Tennessee Code Annotated section 36-6-406(a)(2) states:

The permanent parenting plan and the mechanism for approval of the permanent parenting plan shall not utilize dispute resolution, and a parent's residential time as provided in the permanent parenting plan or temporary parenting plan shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:
. . .

erred in failing to limit Mother's parenting time. Tennessee Code Annotated section 36-6-406(a), however, applies only if there has been a determination that the child's best interests require a change in the primary residential parent. *See Armbrister v. Armbrister*, 414 S.W.3d 685, 697-98, 706 (Tenn. 2013). We have already determined that the trial court did not err in finding that it was in the child's best interest for Mother to remain the primary residential parent. We need not, therefore, proceed to address Tenn. Code Ann. § 36-6-406(a).

(3)

Father also asserts that, even if he was not made the primary residential parent, he should have been given more parenting time pursuant to the statutory directive to permit maximum parental participation. *See* Tenn. Code Ann. § 36-6-106(a). He argues that he should receive "substantially equal time with the child." We have determined that Father waived this issue because it was not raised at trial. *See Blankenship v. Anesthesiology Consultants Exch., P.C.*, 446 S.W.3d 757, 760 (Tenn. Ct. App. 2014).

(4)

In light of our conclusions regarding the other issues, we need not consider Father's argument regarding attorney fees.

CONCLUSION

The judgment of the trial court is affirmed. Costs of appeal are assessed against the appellant, and execution may issue if necessary.

_____<br>
ANDY D. BENNETT, JUDGE

---

(2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.

21